PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

Nos. 20-1750 and 20-1751

———————————

In re: WEINSTEIN COMPANY HOLDINGS LLC, et al.,

Debtors

SPYGLASS MEDIA GROUP, LLC, f/k/a Lantern
Entertainment LLC

v.

BRUCE COHEN PRODUCTIONS; BRUCE COHEN,
　　　　　　　　　　　　　Appellants in 20-1751

BRADLEY COOPER; 22ND & INDIANA, INC.; BRUCE
COHEN; BRUCE COHEN PRODUCTIONS; ROBERT DE
NIRO; CANAL PRODUCTIONS, INC.; DAVID O.
RUSSELL; KANZEON CORP.; JON GORDON; JON
GORDON PRODUCTIONS, INC.,

Appellants in 20-1750

————————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos.  1-19-cv-00242 and 1-19-cv-00243)
District Judge: Honorable Maryellen Noreika

————————————

Argued January 13, 2021


Before: AMBRO, KRAUSE, and PHIPPS, <u>Circuit Judges</u>


(Opinion filed:  May 21, 2021)


Angela M. Butcher (Argued)
Michael I. Gottfried
Roye Zur
Elkins, Kalt, Weintraub, Reuben, Gartside
10345 West Olympic Boulevard
Los Angeles, CA 90064

Kevin S. Mann
Christopher P. Simon
Cross & Simon
1105 North Market Street
Suite 901, P.O. Box 1380
Wilmington, DE 19899

        Counsel for Appellants

Thomas R. Califano (Argued)
Sidley Austin
787 Seventh Avenue
New York, NY 10019

R. Craig Martin, Esq.
DLA Piper
1201 North Market Street
Suite 2100
Wilmington, DE 19801

        Counsel for Appellee


Anne M. Collart
William P. Deni, Jr.
Lawrence S. Lustberg
Gibbons
One Gateway Center
Newark, NJ 07102

        Counsel for Amicus Appellant Producers
        Guild of America Inc.

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

The Chapter 11 bankruptcy process gives a debtor many means to rehabilitate its business, including several to manage contractual obligations. Chief amongst them is the flexibility to assume (*i.e.*, continue) or reject (*i.e.*, breach) executory contracts, which are contracts where the debtor and the nonbankrupt counterparty each has material obligations left to perform as of the bankruptcy filing.

With great power comes great responsibility. To assume an executory contract, a debtor must cure existing defaults and put the contract in the same place as if the bankruptcy never happened. *See* 11 U.S.C. § 365(b)(1)(A). This scheme interacts with the Bankruptcy Code's sale provision, 11 U.S.C. § 363, which allows a purchaser to buy substantially all the debtor's property "free and clear of any interest in such property." *Id.* § 363(f). In practice, an executory contract can be "assumed" and then "assigned" to a buyer under § 365 of the Bankruptcy Code provided all existing defaults are cured. A non-executory contract, on the other hand, can be sold under § 363 to a buyer, who must satisfy post-closing obligations but need not worry about pre-closing breaches or defaults, which typically remain unsecured claims against the debtor's estate. Thus, whether a contract is classified as executory or non-executory has significant implications for its treatment in a bankruptcy sale.

This case is about whether a work-made-for-hire contract between a producer and a bankrupt movie company is an executory contract. The Weinstein Company and its affiliates ("TWC" or the "Debtors") filed bankruptcy petitions to facilitate the sale of substantially all their assets to Spyglass Media Group, LLC (a/k/a Lantern Entertainment LLC) under § 363. Spyglass wished to buy TWC's contract with Bruce Cohen (the "Cohen Agreement") for producing the critically acclaimed 2012 film *Silver Linings Playbook*. At stake is whether Spyglass must cure existing defaults and pay around $400,000 owed to Cohen before the sale's closing. *In re Weinstein Co. Holdings, LLC*, No. 18-10601, 2020 WL 1320821, at *5 (D. Del. Mar. 20, 2020). As discussed below, because Cohen's remaining obligations under the Cohen Agreement are not material and the parties did not clearly avoid New York's substantial performance rule, we affirm the District Court's affirmance of the Bankruptcy Court's decision and hold the Cohen Agreement is not an executory contract.

I.

In September 2011, Cohen and his production company entered into the Cohen Agreement with SLP Films, Inc., a non-debtor special purpose entity formed by TWC to make *Silver Linings Playbook* (the "Picture"). The parties structured the Cohen Agreement as a "work-made-for-hire" contract, meaning Cohen owned none of the intellectual property in the Picture.[1] App. 2331, Cohen Agreement ¶ 9; *see Cmty. for*

---

[1] Producers can be thought of as project managers for a movie, overseeing various aspects of production such as developing a script, ensuring a film is delivered on time and within budget, and marketing the finished product.

*Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (explaining that the employer exclusively owns all the intellectual property in works made for hire). In exchange, SLP Films agreed to pay Cohen $250,000 in fixed initial compensation, as well as contingent future compensation equal to roughly 5% of the Picture's net profits. App. 2328–29, Cohen Agreement ¶¶ 2–3. The contingent compensation provision provides that

> [i]f the Picture is produced with [Cohen] as the producer thereof and [Cohen] fully perform[s] all required services and obligations hereunder and in relation to the Picture, and [is] not otherwise in breach or default hereof, [Cohen] shall be entitled to receive [Contingent Compensation].

App. 2329, Cohen Agreement ¶ 3. The Picture was successfully released in November 2012 and resulted in an Academy Award for Best Actress for Jennifer Lawrence. After some corporate maneuvers, TWC purports to own all the rights pertaining to the Picture, including the Cohen Agreement.[2]

---

[2] A complex web of agreements governed the relationship between TWC and the special purpose vehicles it created for the Picture. App. 2028. According to a former TWC executive, SLP Films transferred its rights in the Picture to SLPTWC Films, LLC, another special-purpose entity. App. 2092–93, 2194–95. SLPTWC dissolved in October 2013 and SLP Films dissolved in April 2016. App. 2195. TWC, as the sole member of SLPTWC, believes it or its affiliates received all the rights in the Picture, including the Cohen Agreement. App. 2029, 2196.

In 2017, TWC's business cratered following a flood of credible sexual misconduct allegations against its co-founder, Harvey Weinstein. Left with few options, TWC tried to sell its business and ultimately found Spyglass as the only interested buyer. In March 2018, TWC filed for Chapter 11 bankruptcy in the District of Delaware and asked the Bankruptcy Court to approve the sale to Spyglass under § 363 of the Bankruptcy Code. The parties documented the sale's terms in an Asset Purchase Agreement (the "Purchase Agreement").

The sale closed in July 2018, though the Purchase Agreement gave Spyglass until November 2018 to designate which of TWC's executory contracts it wanted to assume as part of the sale. App. 691, Purchase Agreement § 2.8(a) (defining "Assumed Contracts"); App. 694, 741. However, Spyglass believed the Cohen Agreement was not executory at all. In October 2018, it filed a declaratory judgment action against Cohen seeking a determination that the Cohen Agreement "is not executory and therefore was already [sold] to [Spyglass] pursuant to Bankruptcy Code section 363." App. 1152. As noted above, if the Cohen Agreement is an executory contract and therefore assumed and assigned under § 365, Spyglass would be responsible for approximately $400,000 in previously unpaid contingent compensation.[3] If Spyglass instead purchased the Cohen Agreement as a non-executory

---

[3] 11 U.S.C. § 365(b)(1)(A) requires the debtor to cure or provide adequate assurance that it will cure all defaults under an assumed executory contract. Here, that responsibility lies with Spyglass, who agreed to "pay all Cure Amounts required to assume the Assumed Contracts." App. 692, Purchase Agreement § 2.8(b).

contract under § 363, Spyglass would be responsible only for obligations on a go-forward basis after the sale closed.[4]

The stakes became even higher.  In November 2018, writers, producers, and actors with similar works-made-for-hire contracts (the "Talent Party Agreements") hitched their wagon to the Cohen dispute and argued that their contracts are also executory, the implication being that Spyglass has to pay them millions of dollars in contingent compensation.  App. 894; Cohen Br. at 6–7; Dist. Ct. Op. at 1, n.1 ("The parties stipulated to joint briefing of these appeals.").

In January 2019, the Bankruptcy Court held a hearing on Spyglass's motion for summary judgment in the Cohen dispute, recognizing that its ruling might serve as a bellwether for the Talent Party Agreements.  It issued a bench ruling granting Spyglass's motion for summary judgment, concluding that the Cohen Agreement was not an executory contract and thus could be sold under § 363 to Spyglass.  App. 2268, Bankr. Hr'g Tr. 135:16–25.[5]  Further, the Bankruptcy

---

[4]  While Spyglass's motivations for buying the Cohen Agreement are irrelevant for the legal question before us, we note for context that Spyglass claims it wanted to purchase the Cohen Agreement as "evidence of [the transfer of intellectual property] and the rights that came with it."  Oral Arg. Tr. 29:6–10.  We are skeptical this is the only reason, as Cohen cannot interfere with the Picture's intellectual property even if TWC breaches the Cohen Agreement.  App. 2331, Cohen Agreement ¶ 9.

[5]  The Bankruptcy Court determined that, based on Spyglass's actions, it could no longer deem the Cohen Agreement excluded from the sale.  If it is executory, then it was assumed

Court concluded that TWC owned the Cohen Agreement, and could sell it, after hearing testimony from TWC's former Executive Vice President, Irwin Reiter, who testified about the chain-of-title for the Cohen Agreement.  *Id.* at 135:16–25, 136:1–3.  The District Court affirmed the Bankruptcy Court's decision, and Cohen timely appealed to us.[6]

## II.

The District Court had jurisdiction under 28 U.S.C. § 158(a)(1) over the appeal from the final judgment of the Bankruptcy Court, which had jurisdiction under 28 U.S.C. §§ 157(b) and 1334.  We have appellate jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291.

We stand in the shoes of the District Court and exercise plenary review of the Bankruptcy Court's decision granting summary judgment in favor of Spyglass.  *In re AE Liquidation, Inc.*, 866 F.3d 515, 522 (3d Cir. 2017).  We may affirm the grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).  We view all facts in the light most favorable to Cohen, who, as the non-moving party, is entitled to every reasonable inference that can be drawn from the record.  *Id.* at 522–23.  "We do not

---

and then assigned to Spyglass.  If it is non-executory, then Spyglass purchased the rights under it under § 363.  App. 2173, Bankr. Hr'g Tr. 40:22–23 ("I think they lost the right to call them an excluded asset.").  The parties do not dispute this ruling on appeal.

[6] The Producers Guild of America filed a short amicus brief in support of Cohen.

weigh the evidence; rather, we assess whether [it] is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 523 (internal quotation marks and citation omitted). In short, summary judgment in favor of Spyglass is appropriate if no reasonable jury could conclude the Cohen Agreement is an executory contract.

III.

Section 365(a) of the Bankruptcy Code governs the treatment of executory contracts, but it does not define that term. Rather it provides that "[e]xcept as provided in sections 765 and 766 of this title [involving customer instructions and property not relevant here] and in subsections (b), (c), and (d) of this section, the trustee [or a debtor-in-possession, *see* 11 U.S.C. § 1107(a)], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Without a definition of the word "executory," the Supreme Court recognized that legislative history generally "indicates that Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.'" *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 58 (1978)).

However, this reading "would cut too broadly," as almost all contracts involve some unperformed obligations on both sides. *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 238 (3d Cir. 1995). Thus, our Circuit (and several others) adopted the following definition proposed by Professor Vern Countryman: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the

contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *see also In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623 (3d Cir. 2005) (quoting Countryman and citing to *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)); 3 Collier on Bankruptcy ¶ 365.02[2](a) n.10 (16th ed. 2020) (collecting cases). "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365." *Columbia Gas*, 50 F.3d at 239. "The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *Id.* at 240. What constitutes a material unperformed obligation is governed by relevant state law. *See id.* at 239 n.10. Putting all this together, the test for an executory contract is whether, under the relevant state law governing the contract, each side has at least one material unperformed obligation as of the bankruptcy petition date.

To facilitate the debtor's rehabilitation, the Countryman test attempts to foolproof the debtor's choice to assume or reject contracts; thus, the debtor only has that flexibility for executory contracts—those contracts where there could be uncertainty about whether they are valuable or burdensome. A helpful perspective is to view executory contracts "as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability." *Columbia Gas*, 50 F.3d at 238 (citing Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 106–07 (1986)). Under this framework, a contract where the debtor

fully performed all material obligations, but the nonbankrupt counterparty has not, cannot be executory; that contract can be viewed as just an asset of the estate with no liability.  *See* 3 Collier, *supra* ¶ 365.02[2](a).  Treating it as an executory contract risks inadvertent rejection because the debtor would in effect be giving up an asset by rejecting it.  *Id.*  On the other extreme, where the counterparty performed but the debtor has not, the contract is also not executory because it is only a liability for the estate.  *Id.*  Treating it as an executory contract risks inadvertent assumption, for the debtor would effectively be agreeing to pay the liability in full when the counterparty should instead pursue the claim against the estate like other (typically unsecured) creditors.  It logically follows that where "the only remaining obligation is the [debtor's] duty to pay"— the contract is not executory.  *See In re Teligent, Inc.*, 268 B.R. 723, 732 (Bankr. S.D.N.Y. 2001); *see also Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985).  Thus, only where a contract has at least one material unperformed obligation on each side—that is, where there can be uncertainty if the contract is a net asset or liability for the debtor—do we invite the debtor's business judgment on whether the contract should be assumed or rejected.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019); *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008).

This context meshes with how a buyer can purchase the debtor's contracts as part of a § 363 sale.  If the buyer wants to buy an executory contract, the debtor must assume and then assign that contract to the buyer.  *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 251 (3d Cir. 2003) (explaining that typically "the debtor must first assume [a contract] in order to transfer it") (citing *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 47

(Bankr. D. Del. 1999)).  To assume a contract, the debtor or the buyer must cure all existing defaults (or provide adequate assurance of a cure), basically putting the contract in the same place as if the bankruptcy did not happen.  *See* 11 U.S.C. § 365(b); *Columbia Gas*, 50 F.3d at 238 (noting that, for an assumed executory contract, the Bankruptcy Code "mandates that the debtor accept the liability with the asset and fully perform his end of the bargain").[7]  The requirement to cure existing defaults before assuming a contract is motivated by fairness to the nonbankrupt counterparty, as assuming the contract essentially provides a "means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so."  *Penn Traffic*, 524 F.3d at 382 (internal citation omitted).

However, if the contract is not executory, it can be sold to a § 363 buyer like any other liability or asset.  *Cf. In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. 87, 94 (Bankr. D. Del. 2009) (explaining that § 363 "permits a debtor to transfer its rights and obligations under a non-executory contract").  In the case of a non-executory contract where only the debtor has material obligations left to perform, the contract is a liability of the estate, and if the buyer wants to buy it, the buyer is voluntarily assuming that liability.[8]  Under the terms of the

---

[7] If the executory contract is rejected, that would "relegate the non-breaching party to an unsecured creditor."  *CellNet Data*, 327 F.3d at 249.

[8] One might wonder why a § 363 buyer would ever voluntarily assume liabilities.  Often the issue is negotiated between the debtor and the buyer.  The buyer can receive a discount on the purchase price for taking on the debtor's liabilities.  The buyer

sale, the buyer must typically fulfill obligations under the contract it bought after the sale closes, just as it would with any other asset or liability.  But unless the parties agreed otherwise, no one is required to cure existing defaults, as the nonbankrupt counterparty is already in at least as good a position as without the sale.  *See* 11 U.S.C. § 363(f) (allowing the debtor, after notice and a hearing, to sell its property "free and clear of any interest in such property," subject to certain conditions and applicable non-bankruptcy law); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003) (explaining that successor liability is often extinguished in a § 363 sale).  If no buyer came forward, the nonbankrupt counterparty would only have an unsecured claim against the debtor, on which it can typically expect to recover merely cents on the dollar.  Put differently, there are no fairness concerns, as the counterparty with nothing material left to do on the contract should simply be grateful that someone agreed to buy its contract and assume obligations after the sale's closing.

## IV.

This context sets the stage for the dispute before us.  Is the Cohen Agreement an executory contract?  If so, the contract was assumed and assigned to Spyglass, so it must cure existing defaults and pay approximately $400,000 in contingent compensation to Cohen.  If not, Spyglass only needs to comply with post-closing obligations coming due under the Cohen Agreement,  *see Weinstein*, 2020 WL 1320821, at *5 (noting the Bankruptcy Court's determination, not challenged by either party on appeal, that Spyglass is obligated to purchase

---

may have additional considerations, such as wanting to start things on the right foot with vendors, suppliers, and the like.

the Cohen Agreement as either an executory or non-executory contract), and the $400,000 owed to Cohen pre-closing need not be paid, as it is simply an unsecured claim against the Debtors.

New York law governs the Cohen Agreement.  App. 2336, Cohen Agreement ¶ 23.  Thus, we analyze whether the Agreement "contained at least one obligation for both [TWC] and [Cohen] that would constitute a material breach under New York law if not performed." *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010).  In New York, "[a] material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract." *Feldmann v. Scepter Grp., Pte. Ltd.*, 185 A.D.3d 449, 450 (N.Y. App. Div. 2020) (quoting *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 163 (2d Cir. 2008)).

New York also follows the substantial performance doctrine, meaning "[i]f the party in default has substantially performed, the other party's performance is not excused." *Hadden v. Consol. Edison Co.*, 312 N.E.2d 445, 449 (N.Y. 1974).  These are two sides of the same coin, as "[s]ubstantial performance and material breach are interrelated concepts[;] . . . if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused." *In re Interstate Bakeries Corp.*, 751 F.3d 955, 962 (8th Cir. 2014) (internal quotation marks and citation omitted).

On TWC's side, its obligation to pay contingent compensation to Cohen is clearly material.  Here, the amount

of contingent compensation far exceeded that of fixed compensation, reflecting the market reality that producers often try to work on films that will become hits so they can share in the profits. *See Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (N.Y. App. Div. 2007) (explaining that failure to pay the "primary consideration" under an agreement is a material breach). Having concluded that TWC had at least one material obligation left to perform under the Cohen Agreement, we do not need to analyze whether other obligations, such as TWC's obligation to give Cohen the right of first refusal to produce any sequels, are also material. *See* App. 2332, Cohen Agreement ¶ 13.

Cohen's remaining obligations, however, are a different story. At a high level, the essence of the Cohen Agreement was for Cohen to produce the Picture in exchange for money. Thus, he contributed almost all his value when he produced the movie. At the time of TWC's bankruptcy, the Picture had been released for six years and Cohen had not done any further work on it. Indeed, other courts agree that the employee in a work-made-for-hire contract usually does not have material obligations after the work is completed despite ancillary negative covenants or indemnification obligations. *See In re Qintex Ent., Inc.*, 950 F.2d 1492, 1497 (9th Cir. 1991) (holding that contract between an actor and a production company was not executory after the movies were made because the actor "substantially completed [his] duties under the contracts"); *In re Stein & Day Inc.*, 81 B.R. 263, 266 (Bankr. S.D.N.Y. 1988) (holding that a publishing contract is not executory where the author wrote two books and assigned to the debtor-publisher the "full term of the copyright for the books").

A closer look at Cohen's remaining obligations confirms our suspicion—they are all ancillary after-thoughts in a production agreement. For instance, Cohen agreed to refrain from seeking injunctive relief about the exploitation of the Picture. But that covenant is redundant, for Cohen has no claim to the Picture's intellectual property rights and is already obligated to respect that property under relevant law. App. 2331, Cohen Agreement ¶¶ 9–10; *Stein & Day*, 81 B.R. at 266 (explaining that the agreement not to violate intellectual property in a work is an independent obligation already "imposed by law"). Also immaterial is Cohen's obligation to indemnify TWC against third-party claims arising from the breach of his representations, warranties or covenants, as the statute of limitations has likely expired on most, if not all, of the potential claims. App. 2333–34, Cohen Agreement ¶ 15; *cf. Exide*, 607 F.3d at 964 (explaining that expired indemnity obligation is not material). Finally, the restrictions on Cohen's ability to assign the contract are ancillary boilerplate provisions. For instance, the Agreement requires Cohen to comply with a set of procedures to give TWC the right of first refusal if Cohen tries to sell or assign his right to receive contingent compensation. App. 2350, Cohen Agreement Sch. 1 ¶ 3.5. This obligation, however, is not a "significant undertaking," as Cohen "has no obligation to [TWC] if he wants to accept more favorable terms from [others]." *Stein & Day*, 81 B.R. at 267. In short, none of Cohen's remaining obligations go to the "root of the contract" or "defeat the purpose of the entire transaction" if breached. *Exide*, 607 F.3d at 962–63 (internal quotation marks and citations omitted).

V.

However, our analysis cannot end here. Cohen argues that where parties already agreed an obligation is material, a court should not substitute its own judgment. Here, the Agreement provided that TWC must pay contingent compensation provided Cohen is "not otherwise in breach or default." App. 2329, Cohen Agreement ¶ 3. Based on this provision, he argues that all his obligations are material, as even a breach of a technical provision would excuse TWC's obligation to pay contingent compensation.

Cohen is correct that parties can contract around a default rule such as the substantial performance rule, that is, they can agree that what to the ordinary person is immaterial is nonetheless not so. *See Jacob & Youngs v. Kent*, 129 N.E. 889, 891 (N.Y. 1921) (Cardozo, J.) (explaining that parties can avoid that rule by "apt and certain words"); *see also* Ian Ayres, *Regulating Opt-Out: An Economic Theory of Altering Rules*, 121 Yale L.J. 2032, 2049 (2012) (describing the *Jacob & Youngs* decision as a "determination that the [parties'] actions were insufficient to contract around the substantial performance (default) rule"). In *General DataComm*, we also acknowledged that where the contract makes plain that certain unperformed obligations are material, we can conclude the contract is executory without further analysis. 407 F.3d at 623–24. Put another way, a breach can be considered material if "upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract." 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2018).

Although Cohen's argument is forceful, we ultimately reject it because the parties did not clearly and unambiguously avoid the substantial performance rule for evaluating executory contracts.  For starters, the language Cohen relies on is a nine-word phrase buried in a long covenant provision.[9]  By contrast,

---

[9] The full provision provides as follows (with the key language emphasized in italics).  App. 2329.

> 3.   Contingent Compensation: If the Picture is produced with Artist [Bruce Cohen] as the producer thereof and Lender [Bruce Cohen Productions] and Artist fully perform all required services and obligations hereunder and in relation to the Picture, *and are not otherwise in breach or default hereof*, Artist shall be entitled to receive the following "Contingent Compensation":
>
> (a) 5% of 100% of "Adjusted Gross Receipts" (if any) payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across-the board 15% distribution fee.
>
> (b) "Adjusted Defined Receipts", "Cash Breakeven" and "Contingent Proceeds" shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Company's Exhibit "DRCB" and Exhibit "CB", as modified only by the Riders to such Exhibits, attached hereto and incorporated by reference (and in any event to be defined, computed, paid and accounted for no less favorably than Jon

the cases cited by Cohen where courts deferred to the parties' agreement that all terms in the contract are material dealt with the remedies or termination section. *See Gen. DataComm*, 407 F.3d at 623–24 (providing any breach would cause termination of an employee's benefits plan); *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) (providing that buyer's "breach of any term, even an immaterial term, would allow [seller] to terminate the [agreement] and sue for specific performance"); *Avant Guard Props., LLC v. NYC Indus. Dev.*, No. 115209/10, 2015 WL 7070066, at *5 (N.Y. Sup. Ct. Jan. 7, 2015) (explaining that the contract's termination provision "made it *clear* . . . that only complete performance will satisfy the agreement") (emphasis added).

The distinction between a covenant and termination provision is meaningful. When parties say that breach of a provision would result in termination or rescission of the contract, they make clear that the provision is material. Williston on Contracts § 63:3 (stating that a breach is material if "the parties considered the breach as *vital to the existence of the contract*") (emphasis added). By contrast, covenants address the parties' obligations (*i.e.*, what they must and must not do) and typically are not a natural place to look when

---

Gordon ("Gordon") with respect to the Picture. "Cash Breakeven" shall mean the point at which "Contingent Proceeds" are first achieved, but calculated utilizing the applicable distribution fees referred to above. Company makes no representation that the Picture will generate any Contingent Compensation, or any particular amount of Contingent Compensation.

determining *which* of those obligations the parties consider to be material.

Further, the requirement that Cohen not be in breach or default may be better viewed as a condition precedent to TWC's payment obligation, as evidenced by the word "if" that begins the relevant provision. *See Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012) (describing a condition precedent as an event whose occurrence triggers an obligation). This is relevant, as "[t]here is a distinction . . . between failure of a condition and a breach of a duty . . . . [I]f the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365." *Columbia Gas*, 50 F.3d at 241. Here, the analysis is complicated by TWC having an independent obligation not to be in breach or default even without the condition precedent language. Still, a condition precedent is typically not an obligation itself, nor does it inform which obligations are material. Indeed, Cohen did not point to any authority that held language in a condition precedent contracted around the substantial performance rule. On the contrary, we are persuaded by the reasoning adopted by one court that a condition precedent should not be read so broadly. *See ShermansTravel Media, LLC v. Gen3Ventures, LLC*, 152 N.E.3d 616, 624 (Ind. Ct. App. 2020). There, a settlement agreement required "complete performance" by the defendant for the plaintiff to dismiss a lawsuit. *Id.* The Indiana Court of Appeals rejected the "overly literal reading of the term 'complete' which effectively relieved [the plaintiff of the responsibility] of showing material breach." *Id.* Instead, it held that the substantial performance rule continued to apply where "there is no express provision . . . stating that substantial performance does not apply." *Id.* at 626; *see also Gen. Disc.*

*Corp. v. Weiss Mach. Corp.*, 437 N.E.2d 145, 151 (Ind. Ct. App. 1982).

Finally, if we accept Cohen's argument, then the parties also overrode protections in the Bankruptcy Code. *Interstate Bakeries*, 751 F.3d at 962 ("The doctrine of substantial performance . . . is inherent in the Countryman definition of executory contract."). As explained above, the Code's treatment of contracts facilitates the debtor's rehabilitation by treating non-executory contracts where only the debtor has material obligations to perform as liabilities of the estate, so the debtor does not accidentally assume them without good reason. Here, the logical implication of Cohen's position is that the Cohen Agreement would be an executory contract forever, no matter how much he has already performed. Oral Arg. Tr. 23:22–25. That would be a highly unusual result and would contravene the protections created for the Debtors by the Bankruptcy Code.

To be clear, we recognize that parties can contract around a state's default contract rule regarding substantial performance, and by doing so they can also override the Bankruptcy Code's intended protections for the debtor. However, that result can only be accomplished clearly and unambiguously in the text of the agreement. For the reasons explained above, we do not believe the Cohen Agreement avoided New York's substantial performance rule. As we agree with the Bankruptcy and District Courts that Cohen's remaining obligations are immaterial and ancillary to the purpose of the contract, we hold that the Cohen Agreement is not executory.

VI.

Cohen raises two additional arguments that the Bankruptcy Court erred by granting summary judgment. We are unpersuaded by both.

First, Cohen argues that, even if the Cohen Agreement is not executory on its face, the Bankruptcy Court should have allowed for additional discovery and factfinding. While he is correct that under New York law "[t]he issue of whether a party has substantially performed is usually a question of fact," a court can decide it as a matter of law "where the inferences are certain." *Exide*, 607 F.3d at 963 (citation omitted). Indeed, we previously held that the contracts at issue in *Exide* were not executory based on "[o]ur inspection of the record." *Id.* New York courts have also frequently resolved the materiality of contractual provisions as a question of law. *See, e.g.*, *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617 (N.Y. App. Div. 2011) ("[W]here the evidence concerning the materiality is clear and substantially uncontradicted . . . [,] the question is a matter of law for the court to decide.") (second alteration in original) (citation omitted). In this case, the decisions of the Bankruptcy and District Courts were well supported by the plain text of the Cohen Agreement, as well as uncontradicted evidence that the Picture was made and released nearly six years before the Debtors' bankruptcy filing. Cohen's position is further undercut by the fact he chose not to submit an affidavit or present a witness at the hearing in the Bankruptcy Court. Further, he does not explain what evidence the Bankruptcy Court should develop if there were a remand. In this context, we reject his argument that the Bankruptcy Court erred by not allowing for additional factfinding.

Second, Cohen presses the Hail Mary argument that the Bankruptcy Court did not have enough evidence to conclude that TWC owned the Cohen Agreement and could sell it. However, the Bankruptcy Court's decision is well supported by the testimony of Irwin Reiter, who was the Executive Vice President for Accounting and Financial Reporting at TWC, and later held the same role at Spyglass. After Reiter testified about the chain-of-title for the Cohen Agreement, Cohen's counsel cross-examined him. The Bankruptcy Court determined that, based on "the evidence presented . . . [,] SLPTWC Films did dissolve . . . [and] the debtor, who was the sole member of that LLC, acquired all of the rights to its property." App. 2268–69, Bankr. Hr'g Tr. 135:20–25, 136:4–6. Cohen contends that the Bankruptcy Court neglected to draw factual inferences in his favor, but the summary judgment standard does not require a court to draw improbable inferences. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). We agree with the Bankruptcy Court that the evidence clearly shows SLPTWC dissolved before TWC's bankruptcy and TWC, as its sole member, received all its assets and contract rights.[10] Further, Reiter testified the chain-of-title satisfied banks, as TWC was able to "license the picture . . . [and]

---

[10] Cohen argues that the Bankruptcy Court incorrectly applied New York LLC dissolution law when it should have applied Delaware law. However, we do not see how the two laws meaningfully differ on the question of whether the sole member of an LLC would receive its assets upon dissolution. The two statutes have nearly identical distribution schemes. *Compare* 34 N.Y. Ltd. Liab. Co. Law § 704 *with* 6 Del. Code § 18-804. And both states also have similar provisions on who can wind up an LLC. *Compare* 34 N.Y. Ltd. Liab. Co. § 703 *with* 6 Del. Code § 18-803.

borrow based on the picture." App. 2225, Bankr. Hr'g Tr. 92:4–5. In any event, Cohen never names who else might own the Cohen Agreement if not the Debtors. Hence we agree with the Bankruptcy Court's conclusion that TWC owned the Cohen Agreement and could sell it.

\* \* \* \* \*

Bankruptcy often affects contract counterparties who do business with the debtor. Here, TWC owes money to Cohen under a work-made-for-hire production services contract, but he has no material obligations left to perform, as he produced and released the film several years before TWC's bankruptcy. No provision in the contract clearly and unambiguously overrode New York's default substantial performance rule that obligations are immaterial if they do not go to the root and purpose of the transaction. Accordingly, the Bankruptcy Code views the Cohen Agreement as a non-executory contract that is in essence a liability for the Debtors that can be sold to Spyglass under Bankruptcy Code § 363 without the need to cure existing defaults. Hence the approximately $400,000 in contingent compensation owed to Cohen before the sale's closing does not need to be paid in full, though (if timely) it can still be asserted as an unsecured claim to be paid out in the normal course *pro rata* with other unsecured creditors. This pill is bitter to swallow, but bankruptcy inevitably creates harsh results for some players. We thus affirm the District Court's order affirming the Bankruptcy Court's ruling.